[Cite as *State v. Baker*, 2026-Ohio-1628.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                    Court of Appeals No.  S-24-023

    Appellee                                 Trial Court No.  22 CR 1065

v.

James Baker                                      **DECISION AND JUDGMENT**

    Appellant                                Decided: May 5, 2026

* * * * *

Beth A. Tischler, Sandusky County  Prosecuting Attorney, and
Alexis M. Otero, Assistant Prosecuting Attorney, for appellee.

Brian A. Smith, for appellant.

* * * * *

**OSOWIK, P.J.**

{¶ 1} This is an appeal from the judgment by the Sandusky County Court of

Common Pleas, which sentenced appellant, James R. Baker, Jr., to a reduced indefinite

prison term of nine to 12 years for eight offenses, after the trial court denied appellant's

motions to suppress and to recuse. A jury convicted him for those eight offense, and this

court remanded the matter for resentencing. For the reasons set forth below, this court affirms the judgment of the trial court.

## I. Background

{¶ 2} The subject incident occurred at approximately 10:00 p.m. on Sunday, September 4, 2022, on U.S. Route 6 in Scott Township, Sandusky County, Ohio. Appellee, the state of Ohio, alleged that appellant, while impaired by alcohol and in possession of a firearm, drove his black Ford F-150 pickup truck eastbound in a no-passing zone into oncoming traffic and collided with three vehicles traveling westbound. The first vehicle struck by appellant, a white Ford Focus, contained a driver, M.J., and four passengers who escaped injuries. The second vehicle struck by appellant, a black Chevrolet Colorado, contained a driver, E.S., and one passenger, A.E., who were injured. The third vehicle struck by appellant, a blue Ford Five Hundred, contained a driver, S.I., and three passengers, C.F., V.M., and D.R.W., II, who were injured with D.R.W., II dying at the scene.

{¶ 3} Among the many responders to the crash scene, Trooper Donte' Hanns of the Ohio State Highway Patrol, while wearing his body-worn camera, was the lead investigator who first interviewed appellant in the ambulance and then at the hospital "to get his statement of what caused the crash to happen." He personally observed appellant's alcohol impairment at the crash scene and at the hospital, obtained the search warrant for the blood the hospital collected for appellant's trauma care, and sent the blood to the state highway crime lab to test for appellant's blood-alcohol concentration, which a certified

2.

analyst confirmed to be above the legal limit. He also seized the firearm from appellant's F-150.

{¶ 4} On December 16, 2022, a Sandusky County Grand Jury indicted appellant with the following ten offenses:

> Indictment count No. one: aggravated vehicular homicide of D.R.W., II in violation of R.C. 2903.06(A)(1)(a) and 2903.06(B)(2)(a), a second-degree felony
> Indictment count No. two: aggravated vehicular assault of S.I. in violation of R.C. 2903.08(A)(1)(a) and 2903.08(B)(1), a third-degree felony;
> Indictment count No. three: aggravated vehicular assault of C.F. in violation of R.C. 2903.08(A)(1)(a) and 2903.08(B)(1), a third-degree felony;
> Indictment count No. four: aggravated vehicular assault of V.M. in violation of R.C. 2903.08(A)(1)(a) and 2903.08(B)(1), a third-degree felony;
> Indictment count No. five: aggravated vehicular assault of E.S. in violation of R.C. 2903.08(A)(1)(a) and 2903.08(B)(1), a third-degree felony;
> Indictment count No. six: aggravated vehicular assault of A.E. in violation of R.C. 2903.08(A)(1)(a) and 2903.08(B)(1), a third-degree felony;[1]
> Indictment count No. seven: operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of them-OVI, in violation of R.C. 4511.19(A)(1)(a) and 4511.19(G)(1)(b), a first-degree misdemeanor;
> Indictment count No. eight: operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of them-OVI, in

---

[1] Indictment count No. six was suddenly dismissed by appellee during trial. Then the trial court renumbered the subsequent counts on the jury verdict forms as follows: indictment count No. seven as count No. six, indictment count No. eight as count No. seven, indictment count No. nine as count No. eight, and indictment count No. ten as count No. nine. To maintain consistency, this decision will follow the indictment's numbering of the counts. At the resentencing hearing on February 5, 2024, the trial court explained, "It appears that maybe there was lack of (inaudible) inability to understand what the Court had done with one of the counts when one of the counts in chambers was -- was dismissed and the remaining counts were renumbered for the jurors, so that became a bit of an issue for the Appellate Court."

3.

violation of R.C. 4511.19(A)(1)(f) and 4511.19(G)(1)(a), a first-degree misdemeanor;

Indictment count No. nine: improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(B) and 2923.16(I), a fourth-degree felony with a specification for forfeiture of a weapon under R.C. 2941.1417(A); and

Indictment count No. ten: improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(D)(2) and 2923.16(I), a fifth-degree felony with a specification for forfeiture of a weapon under R.C. 2941.1417(A).

{¶ 5} Then on April 9, 2024, appellant filed a motion to suppress his pre-*Miranda* statements to law enforcement at the hospital on September 4 and 5, 2022. Although appellant was not under arrest at any time during his interviews with Trooper Hanns and was reminded of that by Trooper Hanns, he received the *Miranda* advisements as a precaution. While appellant's motion did not specify any statements he sought to suppress, we glean from the hearing record one pre-*Miranda* statement, which appellant repeated post-*Miranda*. Appellant said he was the passenger in the crashed F-150, and an unidentified driver, who had just been released from jail, ran away from the scene right after the accident. No corroborating evidence from the crash scene was ever found.

{¶ 6} Appellant predominantly sought to suppress the search warrant to seize the blood vials drawn by the hospital at the time he was admitted for trauma-care treatment and the state crime lab blood test results showing his elevated blood-alcohol concentration. Appellee opposed the motion, and following an evidentiary hearing on July 29, at which five witnesses testified and 12 exhibits were admitted into evidence, the trial court denied appellant's motion on August 20. While the legal conclusions of the

4.

trial judge's decision on the search warrant are correct, there are two factual errors contained in it, which appellant does not raise.[2]

{¶ 7} Then on August 30, 2024, appellant filed a motion to recuse the trial court judge from presiding over appellant's trial by jury because he had authorized a different search warrant on September 7, 2022: for the F-150's airbag control module, also referred to as the "black box." The search warrant was sought by the crash reconstructionist, Trooper Ryan Thomas, for the electronic information collected and retained in the F-150's diagnostic computer, and/or any other electronic information to determine pre-crash speeds and driver inputs, pre/post crash movements of the vehicle and environmental/roadway factors. Appellant argues that after the trial judge authorized the search warrant, he demonstrated bias against appellant when he overruled objections raised by his attorney during the trial and imposed mandatory, consecutive sentences to indictment count Nos. two, four, and five upon remand from this court. Appellee responded that there was nothing in the search warrant to prejudice the trial court because

[2] First, the trial court's decision names the search warrant's issuing judge as "Sandusky County Court No. 2 Judge Mary Beth Fiser," when it was Toledo Municipal Court Judge Amy Berling, being in the same city where the blood vials were physically located. The testimony at the suppression hearing from Trooper Hanns, and the search warrant admitted into evidence, is that Judge Berling received Trooper Hanns' affidavit for the search warrant and issued it within two days after the accident. Second, Judge Berling's search warrant was not to draw appellant's blood, but to seize it and analyze it. Trooper Hanns confirmed the three blood vials contained appellant's blood because the hospital lab marked them with appellant's name, the date of the incident, and when he was admitted to the hospital. He took possession of the three blood vials from the hospital lab and then immediately secured those blood vials in tamper-resistant packaging and sent them in the U.S. mail with tracking, according to standard protocol, to the highway patrol's crime lab in Columbus for analysis.

5.

everything in it was eventually in the indictment and merely informed the trial court of the charges against appellant. On the morning of trial, following a hearing, the trial court denied the motion, explaining:

> I'm going to deny the motion. I don't recall -- until I saw the motion, I didn't recall that I actually did sign a warrant back – almost two years ago. It was related to the electronic information collected and retained by the vehicle's Air Bag Control Module to get it more specific and/or the vehicle's diagnostic computer and any other electronic information, so I would agree that there's nothing that's been brought to this Court's attention through any pretrial motions that sought to have any of the information suppressed. Also, the Court finds that the information contained within the Affidavit that's attached to the motion provides just about as much detail as you would see in the Indictment itself, so I'm going to deny the motion, and we'll proceed.

{¶ 8} The three-day jury trial commenced on September 3, 2024,[3] where the jury received testimony from 17 witnesses and 52 exhibits were admitted into evidence. Appellant did not offer into evidence any witnesses or exhibits. The relevant testimony is summarized below.

{¶ 9} The five victims, E.S., A.E., S.I., C.F., and V.M. each testified as to the impact of appellant's F-150 colliding with the second and third vehicles, their resulting injuries, and the death of D.R.W., II in the third vehicle. M.J., the driver of the first vehicle appellant struck, described being sideswiped by the F-150's headlights trying to pass another vehicle and the resulting damage to his vehicle. M.J. and his passengers were uninjured and able to render aid at the scene.

---

[3] Appellant originally pled not guilty to all charges on January 12, 2023, and later changed his plea to not guilty by reason of insanity. On March 11, 2024, the trial court found appellant was competent to stand trial.

6.

{¶ 10} K.W. was the driver of a vehicle that appellant passed at a high rate of speed in a no-passing zone by going into oncoming traffic and staying there. He witnessed the three collisions caused by appellant, which occurred about 300 yards ahead of him. He pulled over and went to each car to render aid until first responders arrived. At appellant's F-150, K.W. saw no one else in appellant's vehicle, where the driver was slumped over onto the passenger side, obscuring his face. No one fled from appellant's F-150 while the bright headlights from his own vehicle illuminated the crash scene.

{¶ 11} Ohio State Highway Patrol Troopers Kent Jeffries and Ryan D. Thomas testified as to the crash reconstruction report Trooper Thomas prepared and Trooper Jeffries typed into the final report. Trooper Thomas, a crash reconstruction expert, began gathering witness statements and data from the crash scene within two hours of the accident. Through his training, specialized equipment, and the information from the F-150's "black box," he determined the speed, direction, travel, and operator behavior of appellant's F-150. Trooper Thomas testified that the F-150 was traveling eastbound on U.S. 6., and the other three cars were traveling westbound on U.S. 6. "The F-150 drove left of center in a No Passing Zone and struck the Ford Focus, and, subsequently, the Chevy Colorado and -- struck the Ford Five Hundred head-on." At the moment of impact, the F-150 was traveling at 76-miles per hour in a posted 55-mile per hour zone.

{¶ 12} Michael McGinnis, a Sandusky County EMS supervisor/shift captain and paramedic, testified about responding to the crash scene on September 4, 2022. He observed appellant as the sole person removed from the F-150 on a backboard. He determined that based on appellant's injuries, his ambulance would go to St. Vincent's

7.

hospital in Toledo, which is the closest Level 1 trauma hospital to the crash scene. He also pronounced D.R.W., II dead at the scene.

{¶ 13} Lieutenant Thomas Fought of the Gibsonburg Volunteer Fire Department described that when he reached appellant's F-150, appellant was the sole occupant, with no means to exit without firefighters prying open the passenger door using a Halligan tool. When he entered the vehicle, he detected the odor of alcohol and observed an empty gun holster on appellant's right hip. Fought applied a C-collar[4] to appellant in preparation to remove him from the F-150 on a backboard and smelled alcohol from appellant's breath. In response to appellant mumbling that he was not driving Fought searched the scene for an ejected person but found no one. Fought testified that because of the condition of the driver's door, it was impossible for anyone driving the F-150 to merely open the driver's door and walk away from the crash.

{¶ 14} Trooper Donte' Hanns of the Ohio State Highway Patrol was the investigating officer who testified regarding the interviews he conducted, his observations of appellant's impairments (odor of alcohol from appellant's breath, slurred speech, bloodshot and glassy eyes, and slow mannerisms), his body-worn camera videos taken of appellant's F-150 at the scene, in appellant's ambulance, and in appellant's hospital room, seizing appellant's firearm,[5] obtaining the search warrant for appellant's

---

[4] A cervical collar is used for trauma stabilization.

[5] Trooper Hanns testified that he did not obtain the name of the person to whom the handgun was registered: "[W]hen I find a firearm or any weapon inside of a vehicle, we give the serial number to the dispatcher, and she will do a check to see if it's stolen or anything, but they do not disclose if it belongs to a specific person at the time."

8.

blood held at St. Vincent's hospital, the blood chain of custody, and appellant's conviction on March 21, 2014, from Toledo Municipal Court[6] within ten years of this incident for operating a vehicle while impaired. Trooper Hanns testified, "When I walked into his [hospital] room, I, again, smelled the odor of an alcoholic beverage corning out of the room. Mr. Baker's eyes were bloodshot, and, as I leaned in a little bit closer, I could smell it corning from his breath, and then I started a conversation with him. . . ]H]his speech was slightly slurred."

{¶ 15} Sergeant Scott Gonzales of the Ohio State Highway Patrol testified he assisted Trooper Hanns at St. Vincent's hospital in taking statements and then test-fired the handgun that Trooper Hanns seized from appellant's F-150 and confirmed that it was operable. He also assisted Trooper Hanns with the process of obtaining a search warrant from Toledo Municipal Court for appellant's blood vials held at the hospital.

{¶ 16} Carly Bartson is a certified Ohio State Highway Patrol crime lab analyst with about ten years of specific knowledge, skill, experience, training and education in performing blood-alcohol concentration analysis by gas chromatography[7] and has previously testified about ten times in courts, although not as a court-declared expert.[8] She performed the blood-alcohol concentration analysis of appellant's blood and testified that "as determined by gas chromatography, 0.213 grams by weight of alcohol per 100-

---

[6] Case No. TRC-13-15796-104.
[7] Her experience includes using "Headspace-GC or gas chromatography . . an instrument that separates and analyzes the little compounds. In this case, it tested for the presence or absence of alcohol."
[8] See Evid.R. 702.

9.

milliliters or gram percent of whole blood," with a "measurement of uncertainty . . . [of] plus or minus 0.013 grams."

{¶ 17} After appellee verbally dismissed indictment count No. six prior to the end of trial, on September 5, the jury convicted appellant of eight of the nine remaining indictment counts as follows: guilty of indictment count Nos. one, two, four, five, seven,[9] eight, nine, and ten. The jury found appellant was not guilty of indictment count No. three.

{¶ 18} Sentencing occurred on October 10, 2024, at which the trial court sentenced appellant to an aggregate indefinite term of nine to 13.5 years for the eight convictions. Appellant timely appealed. On January 24, 2025, this court sua sponte remanded the case to the trial court for a final, appealable order because "[t]here is no journal entry terminating one of the counts of aggravated vehicular homicide, presumably Count Six of the indictment."

{¶ 19} Resentencing occurred on February 5, 2025, at which the trial court sentenced appellant to a reduced aggregate indefinite term of nine to 12 years for the eight convictions as follows:

> Indictment count No. one: Six years minimum;
> Indictment count No. two: Definite term of 18 months to be served consecutively to indictment count No. one;
> Indictment count No. four: Definite term of 18 months to be served consecutively to indictment count Nos. one and two;
> Indictment count No. five: Definite term of 12 months to be served concurrent to indictment count Nos. one, two, and four;

---

[9] With the additional finding that appellant was previously convicted of operating a motor vehicle while under the influence of alcohol within ten years before September 4, 2022.

10.

Indictment count No. eight: Definite term of 180 days (merged with indictment count No. seven) to be served concurrent to indictment count Nos. one, two, four, and five;

Indictment count No. ten: Definite term of six months (merged with indictment count No. nine) to be served concurrent to indictment count Nos. one, two, four, and five.

{¶ 20} The trial court found "that a prison term is mandatory[10] by operation of law pursuant to R.C. 2903.06(B)(2)(a)[11] for counts 1, 2, 4, and 5."[12]

{¶ 21} Appellant sets forth five assignments of error in this appeal:

     1.    Appellant's convictions were against the manifest weight of the evidence.

     2.    The trial court erred in denying Appellant's Motion to Suppress, in violation of Appellant's .right against unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

     3.    The trial court's sentence of Appellant was contrary to law and void because the trial court exceeded the scope of the January 24, 2025 remand order from the Sixth District Court of Appeals, and was without subject matter jurisdiction to impose mandatory sentences on Appellant with respect to Counts Two, Four, and Five of the Indictment.

     4.    The trial court judge erred in denying Appellant's Motion for Recusal, in violation of Appellant's right to Due Process under the Fifth and Fourteenth Amendments to the United State Constitution and Article I, Section 16 of the Ohio Constitution.

---

[10] "Mandatory Prison term" is defined at R.C. 2929.01(X) while "mandatory jail term" is defined at R.C. 2929.01(T). The imposition of prison terms are guided by R.C. 2929.14.

[11] R.C. 2903.06(B)(2)(a) states: "Except as otherwise provided in division (B)(2)(b), (c), or (d) of this section, aggravated vehicular homicide committed in violation of division (A)(1) of this section is a felony of the second degree and the court shall impose a mandatory prison term on the offender as described in division (E) of this section."

[12] The trial court explained at the February 5, 2024 resentencing: "Upon (inaudible) prior to that, I noted before the Notice of Appeal actually got filed that there was an error in the sentencing (inaudible) with respect to counts (inaudible) -- Counts 2 and 4. I meant and intended to impose (inaudible), in fact, I did state for the record (inaudible) I meant to im (inaudible) consecutive order with Counts 1, but, unfortunately, the sentencing entry did not reflect that intention. I -- I just (inaudible) on the mandatory box. I'm not sure how that got missed, but, nonetheless, it did, and we're back here to talk about that."

11.

5.    The failure of Appellant's trial counsel to file an Affidavit of Disqualification, pursuant to R.C. 2701.03 and R.C. 2701.031, of the trial court judge, or to request a continuance of the trial to allow trial counsel to file said Affidavit of Disqualification, constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

## II. Manifest Weight of the Evidence

{¶ 22} Appellant's first assignment of error argues his eight convictions were against the manifest weight of the evidence.

{¶ 23} "To evaluate a manifest-weight claim, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses." *State v. McKelton*, 2016-Ohio-5735, ¶ 328. We must decide if the jury clearly lost its way in resolving conflicts in the evidence to create a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. *Id.* A manifest-weight claim questions the effect of the evidence in inducing belief of appellant's guilt by questioning whether the jury could find the inclination of a greater amount of credible evidence was admitted at trial to sustain that decision than not. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The discretionary power to grant a new trial is the exceptional case in which the evidence weighs heavily against the conviction. *Id.* The unanimous concurrence of all three judges of a court of appeals panel is required to overturn, on the weight of evidence, a judgment that results from a jury. *Id.* at 389.

{¶ 24} Appellant primarily argues for all offenses that no witness definitively identified him as the driver of the F-150 that collided with the three vehicles on September 4, 2022. We disagree. Lieutenant Fought testified that appellant was the only

12.

person in the F-150, where there were no broken-through windows and the doors could not open with human strength alone. He had to use a Halligan tool to pry open the passenger door to reach appellant and extract him from the vehicle because access through the driver's door was impossible. EMS shift captain McGinnis testified that appellant was the only person in the F-150 after Fought pried open the passenger door. K.W. testified he saw the F-150 pickup truck collide with three other vehicles and saw only one person slumped from the driver's seat in F-150 immediately following the collision, from which no one fled.

{¶ 25} With respect to indictment count No. one, aggravated vehicular homicide, R.C. 2903.06(A)(1)(a) states "No person, while operating or participating in the operation of a motor vehicle, . . . shall cause the death of another . . . as the proximate result of committing a violation of [R.C. 4511.19(A)]. . . ." "R.C. 2903.06(A)(1)(a) is a strict-liability offense." *State v. Urbanski*, 2023-Ohio-3966, ¶ 22 (6th Dist.), citing *State v. Hohenberger*, 2010-Ohio-4053, ¶ 44-46 (6th Dist.). It is undisputed that D.R.W., II died as a result of appellant driving his F-150 truck head-on into the third vehicle.

{¶ 26} With respect to indictment count Nos. two, four, and five, aggravated vehicular assault, R.C. 2903.08(A)(1)(a) states, "No person, while operating or participating in the operation of a motor vehicle . . . shall cause serious physical harm to another person . . . as the proximate result of committing a violation of [R.C. 4511.19(A).]" It is undisputed that E.S., S.I., and V.M. were seriously injured as a result of appellant driving his F-150 truck head-on into the second and third vehicles.

13.

{¶ 27} In turn, with respect to indictment count No. seven, operating a vehicle under the influence of alcohol, R.C. 4511.19(A)(1)(a) states, "No person shall operate any vehicle . . . within this state, if, at the time of the operation . . . the person is under the influence of alcohol, a drug of abuse, or a combination of them." Lieutenant Fought was the first responder who detected the odor of alcohol from appellant while extracting him from the F-150 and in applying a C-collar around appellant's head. Trooper Hanns detected the odor of alcohol from appellant from the moment he opened the ambulance door to speak with him and during his interview of appellant at the hospital. He also personally observed appellant's glassy and bloodshot eyes, slow mannerisms, and slurred speech.

{¶ 28} Further, with respect to indictment count No. eight, operating a vehicle with a prohibited alcohol concentration in system, R.C. 4511.19(A)(1)(f) states, "No person shall operate any vehicle . . . within this state, if, at the time of the operation . . . the person has a concentration of seventeen-hundredths of one per cent or more by weight per unit volume of alcohol in the person's whole blood." Experienced and certified crime lab analyst Carly Bartson performed the alcohol analysis of appellant's blood-alcohol concentration and determined it to be 0.213 grams, which is well above the limit in R.C. 4511.19(A)(1)(f).

{¶ 29} With respect to indictment count No. nine, improperly handling a firearm in a motor vehicle, R.C. 2923.16(B) states, "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Lieutenant Fought observed an

14.

empty holster on appellant's right hip while extracting him from the wrecked F-150. Trooper Hanns, as confirmed by his body-worn camera video, found and seized a loaded nine-millimeter firearm from the driver's floorboard of appellant's F-150 at the crash scene. Captured on video during Trooper Hanns' post-*Miranda* questioning, appellant admitted to transporting a nine-millimeter "Cannik" handgun for a "friend to look at." Sergeant Gonzales test-fired the firearm seized from the F-150 to confirm it had the same serial number as the one seized and that it functioned. He identified the handgun at trial and it was admitted into evidence without objection.

{¶ 30} With respect to indictment count No. ten, R.C. 2923.16(D)(2) states:

> No person shall knowingly transport or have a loaded handgun in a motor vehicle if, at the time of that transportation or possession . . . the person's whole blood, blood serum or plasma, breath, or urine contains a concentration of alcohol, a listed controlled substance, or a listed metabolite of a controlled substance prohibited for persons operating a vehicle, as specified in [R.C. 4511.19(A)] regardless of whether the person at the time of the transportation or possession as described in this division is the operator of or a passenger in the motor vehicle.

The testimonies by Trooper Hanns, Sergeant Gonzales, Lieutenant Fought, and Ms. Bartson previously outlined support the elements of the foregoing offense by appellant, even if the jury believed appellant's claim that he was just a passenger in the F-150. The discovery of the functioning, loaded handgun in appellant's F-150, the odor of alcohol from his breath, and his elevated blood-alcohol concentration analysis are in the record.

{¶ 31} In light of the testimony and evidence in the record, we find that any rational factfinder could have found the inclination of a greater amount of credible evidence was admitted at trial than not to induce the fact-finder's belief of appellant's

15.

guilt for violating R.C. 2903.06(A)(1)(a), 2903.08(A)(1)(a), R.C. 2923.16(B), 2923.16(D)(2), 4511.19(A)(1)(a), and 4511.19(A)(1)(f). We find the admitted evidence supports inducing a factfinder's belief of appellant's guilt that appellant operated the F-150 that killed D.R.W., II and that caused serious physical harm to E.S., S.I., and V.M. while appellant was under the influence of alcohol, while appellant's blood-alcohol concentration exceeded the legal limit, and while he transported or had possession of a loaded firearm in a motor vehicle in such a manner that the firearm was accessible to the operator or any passenger without leaving the vehicle. We do not find the jury clearly lost its way in resolving conflicts in the evidence to create a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered.

{¶ 32} Appellant's first assignment of error is not well-taken.

### III. Motion to Suppress

{¶ 33} We review the trial court's denial of appellant's motion to suppress as a mixed question of fact and law. *State v. LaRosa*, 2021-Ohio-4060, ¶ 17, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. We accept the trial court's factual findings if they are supported by competent, credible evidence, but review de novo the trial court's legal conclusions. *Id.*

{¶ 34} In support of his second assignment of error, appellant argues the trial court erred when it admitted his hospital-drawn blood evidence and related test results, including the search-warrant seizure of three vials of his blood from the hospital where he received emergency treatment, the hospital lab analysis that followed, and the crime lab analysis of his blood, as well as his statements at the hospital.

16.

{¶ 35} Appellant argues "that his statements were made involuntarily because he was not provided proper warnings under *Miranda v. Arizona,* 384 U.S. 436 (1966)" amid receiving emergency room treatment. Once again, appellant does not identify what statement(s) he seeks to suppress. Appellee responds that *Miranda* does not apply where appellant was not in the state's custody and was at the hospital to receive medical treatment from the vehicle collision. We agree. *State v. Fridley*, 2017-Ohio-4368, ¶ 35-37 (12th Dist.). Trooper Hanns testified that appellant spoke with him voluntarily and following the careful review of the *Miranda* advisements, "he said he understood them," which is confirmed by his body-worn camera video admitted into evidence without objection. No written waiver was sought by Trooper Hanns because, "He's not under arrest to sign any paperwork." Appellant also argues that his consent was not voluntary because he wanted his *Miranda* rights read again. The video shows appellant did not clearly ask for a second reading, and even if he had, Trooper Hanns testified, "I'm not required to read them twice." The video shows Trooper Hanns questioned appellant in a hospital emergency room, not a lockdown environment, and all hospital medical staff still attended to appellant's medical needs during the interview and when necessary, such as when taking x-rays, Trooper Hanns stepped outside the room. There was no indication that appellant's responses were the result of any coercion.

{¶ 36} Appellant next argues to suppress the search warrant itself claiming that "there was no probable cause to obtain a sample of Baker's blood for testing" because Trooper Hanns "did not indicate the intensity of the odor [of alcohol]" and "the trauma of the event, or even medications Baker received before being transported to, or at, the

17.

hospital" could have contributed to appellant's bloodshot and glassy eyes or slurred speech. We are not persuaded. Contrary to appellant's argument, probable cause of driving under the influence of alcohol is not contingent on the intensity of the odor of alcohol. In addition to Trooper Hanns's personal observations of the odor of alcohol from appellant's breath, Lieutenant Fought detected the odor of alcohol from appellant after Fought pried open the passenger door and came near appellant to extract him from his mangled F-150 and to apply a C-collar.

{¶ 37} Finally, appellant argues to suppress evidence because "the collection and testing of Baker's blood was not conducted in compliance with the Ohio Administrative Code and Ohio Revised Code," citing Adm.Code 3701-53-06(B),[13] R.C. 4511.19(D)(1)(a),[14] and 2317.02(B)(5)(b).[15] Appellant argues the potential contamination of the blood evidence due to the use of an alcohol swab by the hospital nurse impacted the reliability of his elevated blood-alcohol concentration results and any conclusions regarding his impairment. In response, appellee argues that Adm.Code Chapter 3701-53-06(B) does not apply because the hospital blood draw was performed out of medical-

---

[13] Adm.Code Chapter 3701-53-06(B) states, "When collecting a blood sample, an aqueous solution of non-volatile antiseptic shall be used on the skin. No alcohols on the skin shall be used as an antiseptic."
[14] R.C. 4511.19(D)(1)(a) states, "In any criminal prosecution . . . for a violation of [R.C. 4511.19(A)(1)(a)] or for an equivalent offense that is vehicle-related, the result of any test of any blood . . . withdrawn and analyzed at any health care provider, as defined in [R.C. 2317.02], may be admitted with expert testimony to be considered with any other relevant and competent evidence in determining the guilt or innocence of the defendant."
[15] R.C. 2317.02(B)(5)(b) defines "health care provider" to mean "a hospital, ambulatory care facility, long-term care facility, pharmacy, emergency facility or health care practitioner."

18.

necessity for routine trauma care by trained medical staff, and the lab's blood-test result was a medical record created and maintained in the ordinary course of treatment. Under those circumstances, along with expert testimony, appellant's blood-alcohol test results are admissible pursuant to R.C. 4511.19(D)(1)(a). We agree.

{¶ 38} In this matter, it is undisputed that St. Vincent's hospital, where appellant's blood was drawn and initially analyzed, is a "health care provider" defined by R.C. 2317.02(B)(5)(b).

{¶ 39} Appellee called the registered nurse at St. Vincent's hospital who had experience drawing blood "thousands of times" for a standard "Trauma Panel,"[16] and who drew appellant's blood on September 4, 2022. She testified about her protocols, policies and procedures for drawing blood. She testified that she did not draw appellant's blood due to a court order, so her standard blood-draw protocols included placing a tourniquet on the patient's arm, finding a vein, taking an alcohol swab to clean the area and letting it dry for 30 to 60 seconds before starting an "IV" or doing a "straight stick poke" to then draw out the blood into a sealed tube that is then labeled with date, time, her initials, and the patient's name and then securely send the sealed tube to the hospital's lab. When asked what she recalled was appellant's condition at that time, she replied, "Well, he was really drunk. . . . He was really drunk. His alcohol level was really high."

---

[16] Explained as, "He was a trauma patient, so we do all -- we do a whole rainbow. We check for INR/PTT, which is the thinner/thick of your blood. We'll do an alcohol. We'll do a Pink Top, which is for your blood type, and then we'll do a CBC, BMP on every patient, and we'll do all the scans from head to toe."

19.

{¶ 40} Appellee also called the medical laboratory scientist at St. Vincent's hospital who performed the in-house "Trauma Panel"[17] lab testing within 30 minutes of the registered nurse's blood draws from appellant, and testified as to her training, experience, certifications, testing protocols, policies and procedures. Due to the "abnormal result" of a high-level of ethanol in appellant's blood, "an ethanol level of 240 milligrams per deciliter," she performed a "double-check" of appellant's lab results to validate the results and to ensure "there's no chance of contamination." She confirmed that appellant's blood draw "was a good blood sample" and "it was not contaminated."

{¶ 41} Appellee also called Ms. Bartson who tested appellant's blood-alcohol concentration and testified as to those testing protocols, policies, and procedures. The analyst testified that the lab received appellant's blood sample on September 9, 2022, and she removed the sample from refrigeration on September 15, to perform the blood-alcohol testing. She is specifically "authorized by the Ohio Administrative Code to perform this [blood-alcohol] testing," and her certification was admitted into evidence without objection. She performed appellant's blood-alcohol analysis under Ohio Administrative Code requirements and generated the report of those results: "As determined by Gas Chromatography: 0.213 grams by weight of alcohol per one hundred percent or grams percent of whole blood."

---

[17] Explained as "usually most times it's an ED tox panel, which includes your ethanol, tricyclics, which, in this case, I don't believe those were ordered, ah, it's usually a glucose, electrolytes, PT, PTT, a CBC, and usually a type and screen."

20.

{¶ 42} This court previously determined, under nearly identical facts where a defendant was transported to a hospital for emergency care immediately after a vehicle collision and underwent a non-forensic, or medical, blood alcohol test, by a hospital nurse using standard protocols of applying an alcohol swab to disinfect that defendant's arm, the result of such "any test of any blood" was admissible in any criminal prosecution with expert testimony because it was drawn and analyzed by a health care provider as defined by R.C. 2317.02. *State v. Mendoza*, 2011-Ohio-1971, ¶ 15-20 (6th Dist.), citing R.C. 4511.19(D)(1)(a) and *State v. Davenport*, 2009-Ohio-557 (12th Dist.), ¶ 16. Identical to this matter, that appellant was "charged with violations of R.C. 4511.19(A)(1)(a), 2903 .06(A)(1)(a) and 2903.08(A)(1)(a); according to R.C. 4511.181(A)(4), [and] violations of those three offenses are 'equivalent offenses' as set forth in R.C. 4511.19(D)(1)(a)." *Mendoza* at ¶ 19.

{¶ 43} We found that the foregoing "expert testimony" can be derived from the testimony at the suppression hearing by the nurse and the lab specialist who performed the blood draw explaining the protocols and procedures followed for a trauma-panel blood draw and the related "non-forensic, or medical, blood alcohol test." *Id.* at ¶ 15, 19; *see State v. Owens*, 2016-Ohio-3092, ¶ 25, 27 (6th Dist.). Other districts concur with our interpretation of such "expert testimony" for purposes of R.C. 4511.19(D)(1)(a). *State v. Stankorb*, 2023-Ohio-3808, ¶ 11, 27 (1st Dist.); *State v. Parsons*, 2023-Ohio-502, ¶ 15 (5th Dist.); *State v. Carr*, 2013-Ohio-737, ¶ 65 (11th Dist.); *Davenport* at ¶ 21.

{¶ 44} We find the trial court's factual findings are supported by competent, credible evidence, and accept them. There was no evidence of coercion when appellant

received the proper *Miranda* advisements before he voluntarily answered Trooper Hanns' questions. Trooper Hanns' affidavit for the search warrant detailed his personal observations of appellant's indicators of being under the influence of alcohol. Appellant's blood draw was performed by a health care provider who had done them thousands of times. The subsequent testing of appellant's blood by a certified analysts in a certified lab showed appellant's blood-alcohol concentration above the legal limit. All of the foregoing was supported by testimony and exhibits that were competent, credible evidence to determine appellant's guilt or innocence.

{¶ 45} Having found there is competent, credible evidence to support the trial court's factual findings, upon de novo review, we further find no error with the trial court's decision to deny appellant's motion to suppress.

{¶ 46} Appellant's second assignment of error is not well-taken.

## IV. Remand

{¶ 47} In support of his third assignment of error, appellant argues that his sentence is contrary to law under R.C. 2953.08(G)(2)(b) "because the trial court exceeded the scope of the January 24, 2025 remand order from [this court] and was without subject matter jurisdiction to impose mandatory sentences on Appellant with respect to Counts Two, Four, and Five of the Indictment." Citing *State v. Saxer,* 2023-Ohio-3548, ¶ 9 (6th Dist.), appellant argues "contrary to law" means a violation of a statute or legal regulation at a given time. Confusingly, appellant incorrectly argues that this court "still has jurisdiction in this case." He concludes, "Nothing in this Court's January 24, 2025 Decision and Judgment conferred authority upon the trial court to 'correct' or otherwise

22.

make changes to its original sentence on counts for which Baker had already been sentenced." We disagree.

{¶ 48} As explained in our January 24, 2025 remand order, the trial court order did not comply with Crim.R. 32(C), and the judgment entry appealed by appellant was not a final, appealable order. It is well-established that without a final, appealable order, this court was without jurisdiction to hear the appeal. The trial court's "Revised Uniform Sentencing Entry" journalized on February 5, 2025, was a final, appealable order over which this court then obtained jurisdiction.

{¶ 49} Appellant's third assignment of error is not well-taken.

## V. Recusal

{¶ 50} In support of his fourth assignment of error, appellant argues that the trial judge erred by denying appellant's last-minute motion for recusal, which appellee opposed. Appellant's motion was heard prior to the start of trial on September 3, 2024. Appellant argued his constitutional rights were violated by the same judge who granted the vehicle search warrant then eventually presided over the trial two years later and demonstrated bias against appellant when he overruled objections raised by his attorney and imposed mandatory, consecutive sentences four indictment count Nos. two, four, and five upon remand from this court.

{¶ 51} Appellee responds that there was no prejudice to appellant because the search warrant at issue was referenced in the reconstruction report prepared by Troopers Thomas and Jeffries, which had been provided to the defense months earlier before

23.

appellant failed to raise it at the July 29 suppression hearing, and the search warrant reflected nothing beyond what appeared in the indictment.

{¶ 52} The trial judge decided appellant's motion on the record:

> I'm going to deny the motion. I don't recall -- until I saw the motion, I didn't recall that I actually did sign a warrant back – almost two years ago. It was related to the electronic information collected and retained by the vehicle's Air Bag Control Module to get it more specific and/or the vehicle's diagnostic computer and any other electronic information, so I would agree that there's nothing that's been brought to this Court's attention through any pretrial motions that sought to have any of the information suppressed. Also, the Court finds that the information contained within the Affidavit that's attached to the motion provides just about as much detail as you would see in the Indictment itself, so I'm going to deny the motion, and we'll proceed.

{¶ 53} Importantly, appellee responds to appellant's assignment of error that he waived his bias argument on appeal because appellant failed to file an affidavit to disqualify the trial judge, citing *State v. Osie*, 2014-Ohio-2966, ¶ 64-65 and *State v. Hale*, 2008-Ohio-3426, ¶ 78. R.C. 2701.03 "establishes the procedures for filing an affidavit of disqualification against a common pleas judge" and Ohio Const. art IV, § 5(C) "vests exclusive authority to pass on disqualification matters in the chief justice or her designee." *Osie* at ¶ 62. Consequently, this court is without authority to pass upon disqualification or to void the judgment of the trial court upon that recusal/disqualification basis, citing *Beer v. Griffith,* 54 Ohio St.2d 440, 441-442 (1978). We agree.

{¶ 54} Nevertheless, this court recognizes that to the extent appellant's motion to recuse seeks a new trial on appeal due to judicial bias, he has the burden to establish by compelling evidence the appearance of such bias to overcome the presumption that a judge

24.

is unbiased and unprejudiced in the matters over which he or she presides. *State v. Elkins*, 2024-Ohio-5351, ¶ 11 (6th Dist.). Appellant fails to meet his burden. The overwhelming import of the examples of judicial bias identified by appellant are evidentiary rulings related to his failed motion to suppress the blood-alcohol evidence of his impairment at the time he crashed into three vehicles. Such rulings are unrelated in any way to the information, facts, or circumstances that the trial judge was privy to in the search warrant affidavit for the vehicle's electronic information, which was to determine pre-crash speeds and driver inputs, pre/post crash movements of the vehicle and environmental/roadway factors.

{¶ 55} Appellant's fourth assignment of error is not well-taken.

### VI. Ineffective Assistance of Counsel

{¶ 56} In support of his fifth assignment of error, appellant argues that his trial counsel was ineffective for two reasons: failing to file an affidavit of disqualification under R.C. 2701.03 and 2701.031, and failing to file a continuance to file said affidavit.

{¶ 57} An ineffective assistance of counsel claim must overcome the strong presumption that a properly licensed Ohio lawyer is competent. *State v. Hamblin*, 37 Ohio St.3d 153, 155-56 (1988). Appellant offers no evidence that his trial counsel was not licensed to practice law in Ohio, and her competence is presumed.

{¶ 58} To overcome his trial counsel's presumption of competence, appellant has the burden to show both: (1) deficient performance by his trial counsel below an objective standard of reasonable representation, and (2) a reasonable probability of prejudice that but-for his trial counsel's errors, the outcome would have been different,

i.e., that a jury would not have convicted him of eight offenses. *Id.* at 156, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If appellant fails to meet either prong of the *Strickland* test, it is not necessary for us to engage in an analysis of the other prong. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), citing *Strickland* at 697.

{¶ 59} For the first *Strickland* prong, appellate scrutiny of trial counsel's performance is highly deferential. *Id.* at 142, citing *Strickland* at 689. Debatable trial tactics generally do not constitute ineffective assistance of counsel. *State ex rel. Mango v. Ohio Dept. of Rehab. & Correction*, 2022-Ohio-1559, ¶ 24.

{¶ 60} Appellant's arguments for his trial counsel's ineffectiveness relate back to his fourth assignment of error, which we have already decided was not well-taken. Appellant failed to meet his burden to prevail on his motion for recusal of the trial judge, and there is no indication in this assignment of error that an affidavit of disqualification would have resulted in a better outcome for him. We do not find a deficient performance by appellant's trial counsel below an objective standard of reasonable representation.

{¶ 61} Appellant's fifth assignment of error is not well-taken.

### VII. Conclusion

{¶ 62} On consideration whereof, the judgment of the Sandusky County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

26.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

_____
JUDGE

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.